**BAWIDAMANN, Appellee,**

v.

**BAWIDAMANN, Appellant.**

[Cite as *Bawidamann v. Bawidamann* (1989), 63 Ohio App.3d 691.]

Court of Appeals of Ohio,
Montgomery County.

No. 11386.

Decided Aug. 4, 1989.

*Ronald D. Finkleman,* for appellee.

*Diane Kappeler,* for appellant.

FAIN, Judge.

Defendant-appellant, Joseph A. Bawidamann, appeals from a decision of the Montgomery County Court of Common Pleas overruling his motion for a change of custody of his two minor sons, then ages twelve and eleven, despite the boys' election and preference to live with their father. Mr. Bawidamann contends that the trial court abused its discretion in overruling his motion for custody and the boys' decision to live with their father, that that decision was against the manifest weight of the evidence, and that the children suffered denial of their rights of due process and equal protection of the law when the court permitted their attorney to act as their guardian *ad litem,* and, in that capacity, to file a report and recommendation opposing their wishes in the custody matter, after having consulted with them as their attorney.

We conclude that the trial court was within the broad discretion that it has with respect to custody matters when it overruled Mr. Bawidamann's motion for a change of custody, because there was one piece of competent, credible evidence that the boys' choice was not within their best interests. However, we also conclude that when an attorney is appointed guardian *ad litem* and is also appointed to represent the person, the attorney's first and highest duty is to represent his client within the bounds of the law. To have permitted the boys' guardian *ad litem* to act as their attorney denied the boys proper representation of counsel in the protection of their wishes. Accordingly, the judgment will be reversed, and this cause will be remanded for a new

trial. The trial court shall appoint a new guardian *ad litem* to represent the best interests of the boys, and the guardian *ad litem* shall not be represented to the boys as being their attorney with whom they may speak in confidence. If the trial court shall determine that it is necessary or desirable to appoint an attorney to represent either or both of the boys, it shall appoint counsel, separate and apart from the guardian *ad litem,* for that purpose.

## I

In February 1985, the Montgomery County Court of Common Pleas granted a dissolution of marriage to Toni and Joseph Bawidamann. The separation agreement granted custody of their two sons, Andrew and Benjamin, then ages eight and seven respectively, to Toni, upon condition that she not remove the children from the court's jurisdiction without prior court order. Mr. Bawidamann was granted visitation in accordance with the standard order and at all other reasonable times subject to twenty-four-hour notice. The Bawidamanns agreed to split equally the costs of child support since each had about the same income. Mr. Bawidamann was also granted the right to possess and live in the marital residence.

Immediately after the dissolution entry was filed, Mrs. Bawidamann and the boys moved to Arizona to live with her parents, without obtaining a court order. She and the boys later moved to an apartment in Arizona. In January 1986, Mrs. Bawidamann moved the boys to an aunt's home in Dayton, Ohio. In April 1986, they moved again within Dayton.

Counseling had started shortly after the dissolution was granted, interrupted only by Mrs. Bawidamann and the boys' six-month stay in Arizona. The counseling was initiated because of school problems with both boys. The counseling later covered the full range of problems that arose between all four family members. Dr. Miriam Hoefflin provided the counseling and subsequently testified before the referee.

After returning to Dayton, the boys spent approximately equal time with each parent until August 1987. Mr. Bawidamann initiated an altercation at one of the children's sporting events because Mrs. Bawidamann was there with a boyfriend. Mrs. Bawidamann then decided to exercise her discretion as custodial parent to limit Mr. Bawidamann's visitation. She filed a motion to establish a definite visitation schedule and a support order.

In January 1988, an agreed order was filed, reducing Mr. Bawidamann's visitation to alternate weekends from 3 p.m. Friday to 8 a.m. Tuesday, and also from 3 p.m. every Wednesday to 8 a.m. Thursday. Mr. Bawidamann was also required to pay child support of $50 per child per week.

On March 3, 1988, Mr. Bawidamann filed a motion to modify custody and set child support (for both children) pursuant to R.C. 3109.04. Andrew, who would celebrate his twelfth birthday March 8, signed an affidavit electing to be placed in his father's custody; Benjamin, who would celebrate his eleventh birthday March 19, signed an affidavit expressing his preference to live with his father.

By agreement of counsel, Keith Saeks was appointed guardian *ad litem* for the boys in June 1988. Saeks spoke to Andrew and Benjamin together on June 15, without anyone else present. He asked them questions for approximately forty-five minutes. Saeks later testified that Andrew had elected to live with his father and Benjamin had expressed a preference to live with his father, but that he did not feel that their decisions were in their best interests.

Saeks filed his report on June 20, 1988, acknowledging the boys' decisions, but recommending that the court find that there had been no substantial change in circumstances of the children or custodian to warrant modification and that the court deny the boys' election and preference. Saeks' reasons for his recommendation included: the father's influence; their anger and lack of understanding of the import of the decision; their desire to control or manipulate the parents and the situation in order to avoid discipline; and their immaturity.

Mr. Bawidamann's motion was heard before Referee Judith King on June 21, 1988 and August 4, 1988. The boys spoke to the court with only Saeks and King present. Mr. Bawidamann, Mrs. Bawidamann, Hoefflin, and Saeks also testified. King's report acknowledged the boys' decisions. She found that they resented the move to Arizona and that their resentment was difficult to separate from Mr. Bawidamann's. King noted that Hoefflin had testified that the boys' motive to request a change was a result of Mrs. Bawidamann's limits on visitation and their belief that if Mr. Bawidamann had custody he would allow equal time. Each parent was deemed fit to have custody. King also specifically recognized Mrs. Bawidamann's testimony that the boys needed a primary home with quality and not quantity of visitation with the noncustodial parent. King acknowledged the guardian's report and recommendations.

King recommended that the boys' election and preference be denied at that time, and further recommended that Mr. Bawidamann's motion be overruled since there were no other grounds for change of custody based on the evidence presented.

The court considered King's report, the objections to it, and the transcript before making its decision. The court deemed both parents fit for custody. It found Mr. Bawidamann's allegations of an unhealthy atmosphere as provid-

ed by Mrs. Bawidamann unfounded. It acknowledged the childrens' wishes, but noted that the guardian *ad litem* had concluded that their desires were outweighed by other factors, and therefore should not be heeded. The court further found Mr. Bawidamann's motivation was based more on a desire for revenge than on the well-being of his children. The court held that after due consideration of all the factors in R.C. 3109.04, a change of custody would not be in the best interests of either child, and denied Andrew's election and Benjamin's preference. From this ruling, Mr. Bawidamann appeals.

## II

Mr. Bawidamann's first assignment of error is as follows:

"The trial court erred and abused its discretion by its decision to overrule petitioner-appellant's motion for custody of his two minor sons and to deny the children their choice/preference to live in the custody of their father, against the manifest weight of the evidence."

The trial court shall allow any child who is twelve years of age or older to choose, in an original proceeding on custody or a proceeding for modification of a prior custody order, the parent with whom the child is to live, unless the court finds the selected parent unfit or unless the court finds that it would not be in the best interests of the child to choose. R.C. 3109.04(A). Mr. Bawidamann contends that Ohio courts have consistently respected a statutorily eligible minor's choice absent evidence of the movant's unfitness. Additionally, he asserts that there is a presumption in favor of the child's choice absent clear evidence that it would not be within the child's best interests.

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. Furthermore, questions concerning the credibility of conflicting testimony and the weight to be accorded certain evidence are primarily left to the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

Issues involving child custody and visitation are peculiarly within the very broad discretion of the trial court. *Trickey v. Trickey* (1952), 158 Ohio St. 9, 14, 106 N.E.2d 772, 774. The knowledge obtained through contact with and observation of the parties cannot be conveyed to a reviewing court through the printed word. *Id.*

The custodial parent has a strong interest in his or her children. R.C. 3109.04 promotes the stability of the custodial bond, as demonstrated by the

criteria used in change of custody cases. The court is required to find a change of circumstances subsequent to the prior custody award to allow a change of custody. *Ross v. Ross* (1980), 64 Ohio St.2d 203, 206, 18 O.O.3d 414, 416, 414 N.E.2d 426, 428.

In *Dailey v. Dailey* (1945), 146 Ohio St. 93, 32 O.O. 29, 64 N.E.2d 246, the Ohio Supreme Court interpreted Section 8033 of the General Code, now R.C. 3109.04, and held that when a child, in the custody of a divorced parent by a prior court order, turns ten and, in a court proceeding involving the modification of the prior order, chooses as custodian the other parent, who is not unfit by reason of moral depravity, habitual drunkenness or incapacity, there is a change of conditions requiring modification. *Dailey v. Dailey, supra,* paragraph three of the syllabus.

■ Amendments to R.C. 3109.04 have discredited some of the *Dailey* holding. However, concerning its holding on the need and criteria for a change of circumstances, *Dailey* is still sound law. *In re Custody of Smelser* (C.P.1969), 22 Ohio Misc. 41, 51 O.O.2d 31, 257 N.E.2d 769. A child's arrival at the statutory age (ten when *Dailey* was decided), accompanied by his election of the parent who does not presently have custody and would not be deemed unfit, is a change in circumstances. *Dailey, supra,* at 95, 32 O.O. at 30, 64 N.E.2d at 247.

■ Under R.C. 3109.04(A), the trial court is permitted to deny the wishes of the child when conditions surrounding the custody change indicate it is not in the best interests of the child and the benefits of the custody change would not outweigh the harm caused by such change. *Venable v. Venable* (1981), 3 Ohio App.3d 421, 426, 3 OBR 498, 504, 445 N.E.2d 1125, 1131. To determine the best interests of a child in an action where one parent is seeking to modify custody, where both parents are deemed fit, and where the child has expressed a preference or election pursuant to R.C. 3109.04, the trial court must look to the totality of the circumstances surrounding the change. *Venable, supra,* at 426, 3 OBR at 504, 445 N.E.2d at 1131. It is possible that even where a parent is not unfit and notwithstanding the child's preference, the court may find that the change of custody is not in the child's best interest. *Id.* See, *e.g., Lerch v. Lerch* (Mar. 9, 1988), Greene App. No. 87–CA–43, unreported, 1988 WL 29273. To reiterate, the paramount factor is what is in the best interests of the child. *Ross v. Ross* (1980), 64 Ohio St.2d 203, 207, 18 O.O.3d 414, 417, 414 N.E.2d 426, 429.

■ In the case before us, after considering the findings of fact contained in the referee's report and in the transcript, the trial court found that both parents were fit to have custody of the children. Therefore, the change in

circumstances to be considered would have been Andrew's election. The court also found that Mr. Bawidamann's allegation of the unhealthy environment provided by Mrs. Bawidamann was untrue. It agreed with the guardian *ad litem's* recommendation that the children's desires were outweighed by other factors and should not be heeded. The court found that Mr. Bawidamann had exerted a subtle manipulative power over the boys, and further, that his action was based more on his desire for revenge than for the well being of the children. After consideration of all the factors prescribed in R.C. 3109.04, including the election of Andrew and the preference of Benjamin, the court determined that it would not be in the best interests of the children to permit the custody change.

Andrew expressed a rational preference for his father based on his previously expressed desire to spend roughly equal time with each parent. Andrew's preference is expressed in the following testimony:

"Q. Okay, and why did you make this decision, Andrew? What kinds of things were you thinking about?

"A. Well, my mom didn't make good decisions and she made a lot of mistakes, and she—she cut off the time more with my dad down to a minimum, which was every other weekend and every Wednesday from 4:00 to 8:00.

"Q. How were you visiting before that happened?

"A. It was half and half.

" * * *

"Q. So right after they got divorced for how long did you visit more than normal—more than the minimum?

"A. Two of the three years.

"Q. Two to three years, and give me an idea—

"A. No, two out of three years.

"Q. Two of the three years.

"A. Yeah. For the past year we have been visiting every other weekend and every Wednesday, but after the court thing was filed, our dad got every Monday. After the papers were filed, we got every other Monday with Dad."

Andrew further elaborated on his reasoning during questioning by the mother's counsel:

"Q. And did your dad tell you that if you chose him as custodian, he would provide equal visitation?

"A. Yeah, about equal.

"Q. About equal, and what was your understanding as to the 'about equal?'

"A. About what it is now, but the reason—

"Q. About what it is now?

"A. Yeah.

"Q. And what is that?

"A. Just about one day difference, maybe two days difference between the month, but the reason I chose him was because my mom makes a lot of mistakes, and it is not just one.  * * * "

Referee King found that the restoration of roughly equal visitation, the principal reason expressed by Andrew for his preference, would not be in his best interests because he needed a primary parent and home. The only evidence to support this reasoning was Mrs. Bawidamann's somewhat conclusory testimony that her sons needed to have a primary parent and home, rather than to spend roughly equal time with the noncustodial parent. In view of the broad discretion extended to the trial court in custody and visitation matters, we are not prepared to hold that the trial court abused its discretion by adopting this finding as part of the report and recommendation of the referee.

Nevertheless, since this cause is being remanded for the reasons set forth in Part III of this opinion, we have decided to take the somewhat unusual step of noting that we would probably have exercised the discretion available to the trial court differently, for the reasons that follow, and we invite the trial court, on remand, to reconsider its reasoning.

The referee may have relied heavily upon the guardian *ad litem's* recommendation in making her report and recommendation. In his recommendation, the guardian *ad litem* discounted the boys' election and preference as being the product of their father's manipulation. Alternatively, and somewhat inconsistently, he discounted it as being the product of the boys' own manipulative tendencies. From this author's experience with domestic relations practice, it is not surprising to find all of the participants in a custody battle, including the children, exhibiting manipulative behavior. To discount a statutory election because of the presence of manipulative behavior by one or more of the parties would go a long way toward eviscerating the statute.

Indeed, the guardian *ad litem's* report reads much like an indictment of the statutory election, generally. He considered it unfair to impose such a responsibility upon children, for example. These conclusions would be more appropriate in a report to the General Assembly recommending the repeal of the provision for statutory election.

In general, we would have found the guardian *ad litem's* recommendation unpersuasive.

The evidence in favor of choosing Mrs. Bawidamann over Mr. Bawidamann is no more compelling than the evidence in favor of choosing Mr. Bawidamann, and perhaps less compelling. Mrs. Bawidamann moved four times within three years and planned to move again, while Mr. Bawidamann had lived in the same place since 1977. Both children had expressed satisfaction with their school and pleasure with the friends they had made in their father's neighborhood.

Dr. Hoefflin testified that while she had not specifically recommended the extensive visitation by the noncustodial parent that the boys enjoyed prior to August 1987, it seemed to work out well for everyone involved. Hoefflin, who had counseled all four of the Bawidamanns, further encouraged Mrs. Bawidamann to reconsider her intention to limit visitation because they had been doing so well and Hoefflin knew the boys would be unhappy with the change.

Dr. Hoefflin also testified that Mr. Bawidamann was an active father who gave his children a lot of time and attention. The children enjoyed going places with him. "I would say for the most part they have a good relationship with him."

Dr. Hoefflin further testified:

"Q. How do you feel about Mr. Bawidamann as a parent? Would you feel that he is good for his children or bad for his children?

"A. Oh, Mr. Bawidamann is good for his children. They, you know, feel very bonded with him. They enjoy doing things with him. They do express a desire to be with him.

"Q. Would you see any harm that would come to the children if their father would be awarded custody and their mother would be awarded liberal visitation?

"A. Would be awarded what?

"Q. Liberal visitation.

"A. Liberal visitation. There would be no problem with either of these parents having custody of their children. They are both very good parents. The boys, you know, feel very, you know, strongly about having time with each of their parents, and they have said over and over again that they want equal time with them.

"Q. What has been your experience with Mr. Bawidamann? Has he been open to granting Mrs. Bawidamann time with the children?

"A.  He states that he would be.  He has not, since I have known them, been the person to, you know, have control over that situation.  I know that on weekends when he has the children with him and they have—their mother calls and, you know, she is going shopping, for example, and asks if the boys can go, he is very—you know, he is very generous about letting them go with her.

"So based upon, you know, that, I would have to believe that he would be reasonable in that regard."

However, the weight to be accorded such evidence is for the trial court to determine.  Although the reasons advanced by the trial court in support of its denial of the custody change were minimal as opposed to Andrew's rationally expressed election and the supporting provision of R.C. 3109.04(A), and although we would probably have reached a different conclusion, we cannot say that the trial court abused the very broad discretion afforded it in custody matters.

Mr. Bawidamann's first assignment of error is overruled.

### III

Mr. Bawidamann's second assignment of error is as follows:

"The trial court denied the Bawidamann children their constitutional rights to due process and equal protection of the law by identifying and permitting Keith Saeks to act as 'their attorney,' after he filed a report and recommendation in which he opposed their wishes to be in the custody of their father."

Saeks was appointed guardian *ad litem* for the two boys on June 15, 1988. On February 20, Saeks filed his "Report and Recommendation of Court Appointed Attorney and Guardian Ad Litem for the Minor Children." Mr. Bawidamann contends that Saeks misstated his authority because the court's entry specifically appointed him as the children's guardian *ad litem*, and not as their attorney.  Mr. Bawidamann argues that an attorney should not serve as both guardian *ad litem* and appointed counsel where such roles conflict.

The court's entry of June 15, 1988, specifically appointed Saeks guardian *ad litem* for both boys.  At the hearing before the referee, Saeks testified as to his role in the proceedings:

"Q.  Okay.  Now it was your understanding that you were appointed as guardian *ad litem* to protect just the interest of the children?

"A.  You mean in this particular case?

"Q.  Yeah.

"A. It is my understanding as an attorney, as an officer of the court, that in the capacity of guardian ad litem, that encompasses the duties and responsibilities of not only protecting the best interest of the children and their rights if and when they testify, such as today, but also to assist the court in making, hopefully, a fair, just, and equitable decision as to the issue before it, whether it be visitation or, as in this instance, change of custody.

"Q. And you were appointed by agreed entry; is that correct?

"A. Yes. * * *"

Saeks testified that he had questioned Andrew and Benjamin, as their attorney and as guardian *ad litem*, for approximately forty-five minutes:

"Q. Approximately how much time did you spend talking with Andrew and Ben?

"A. According to my notes and my calculations, that I really didn't watch the clock, approximately three-quarters of an hour.

"Q. And did you talk to them just by themselves?

"A. The two of them by themselves, yes.

"Q. Did you talk to them separately?

"A. No, sir. They were in my office together at the same time. Initially, they came in with the mother on June 15, 1988. I believe that it was 3:00 or 3:30, if my memory serves me correct. The mother—the three of us were in the room together for a matter of a few minutes while I explained my duties, obligations, and responsibilities to all of them *as the court appointed attorney and guardian ad litem.*" (Emphasis added.)

Thus, Saeks held himself out as both an attorney and guardian *ad litem* to the children, as well as to the court. Five days after his talk with the boys, Saeks filed his report, which recommended against Andrew's election and Benjamin's preference.

In *In re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 232, 17 OBR 469, 471, 479 N.E.2d 257, 260, the court held:

"The duty of a lawyer to his client and the duty of a guardian ad litem to his ward are not always identical and, in fact, may conflict. The role of a guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest. The role of the attorney is to zealously represent his client within the bounds of the law. DR 7–101; DR 7–102."

In *Baxter*, one attorney was appointed to serve as both attorney and guardian *ad litem* for a minor unwed mother who was in danger of losing her parental rights. The attorney felt that his ward-client's desire to keep the

baby was not in her best interests. The court found the attorney/guardian *ad litem* had a conflict of interest and the mother was denied proper representation of counsel during proceedings in the juvenile court, stating:

"Considering the foregoing, we hold that when an attorney is appointed to represent a person and is also appointed guardian ad litem for that person, his first and highest duty is to zealously represent his client within the bounds of the law and to champion his client's cause. If the attorney feels there is a conflict between his role as attorney and his role as guardian, he should petition the court for an order allowing him to withdraw as guardian. The court should not hesitate to grant such request." *Id.*

In the case before us, Saeks acted in his capacity as guardian *ad litem* by determining that, in his opinion, the best interests of the children required the rejection of their expressed preferences regarding custody. Saeks also testified that the children's testimony in front of the referee was inconsistent with the answers and information they had previously given him as their attorney:

"Q. And for approximately 45 minutes you had occasion to watch the demeanor of the two children and to ask them questions and take notes on their answers?

"A. Yes, sir.

" * * *

"Q. Okay. Will you tell the court was their testimony in front of the referee consistent with the answers and information that they gave you?

"A. Not in all respects.

"Q. And will you tell the court in what way they were inconsistent?

"A. When I interviewed the children in my office last—well, the 15th of June, which would have been the—a week ago tomorrow, I guess, okay, on a Wednesday afternoon, it was made very clear to me that the boys had made an election in one instance, a preference in the other instance, and the election was to go with father and the preference was to go with father.

"I am talking about Andrew in the instance of the election, and I am talking about Benjamin in the instance of the preference. I asked them for what reasons or reason did they want to go with their father, and Andrew made it very clear to me, * * *.

"The other boy, as I pointed out in my report, was more or less jocular about this thing. He cut up more and laughed. He said his election, he being Andrew, was conditional. I said, 'What do you mean,' and it became obvious that there were two conditions involved in his election.

"One was that there be a joint custody arrangement, and I said, 'I assume then you mean that both parents have custody,' and he answered yes. I—or that one parent have the same amount of time as the other parent, and I don't know what that means, but this is what he said; and I took it at face value, and I said, 'What if you stayed with your mother? What if the court decided that you stay with your mother,' and they both indicated that that would be okay; but his election was conditional, and he did not say that today. That is one difference.

"Q. Okay. Were there any other differences?

"A. Yes. The other difference that I noticed this morning was that they made it very clear, and especially the older one again, that as much as nobody else involved in this case, be it you, Mr. Finkleman, or you, Mr. Baker, or her Honor, Referee King, or Mrs. Hoefflin, the psychologist or Mr. Bawidamann, the father or Mrs. Bawidamann, the mother, nobody in their estimation can make a decision, and because nobody is capable of making a decision, be it a court, a therapist, a lawyer, whoever, they are going to take the ball and run with it and make the decision; and he made that abundantly clear to me, as did Benjamin, that they were making a decision because nobody else in this case could make a decision, including the parents.

"* * * *

"He didn't say that this morning. This is what he told me."

An attorney's use of confidential communications from his client to argue against his client's expressed preference is anything but the zealous representation of his client's cause; it is the antithesis of legal representation.

From the record, it is apparent that Saeks' duties as a lawyer and as a guardian *ad litem* conflicted. As guardian *ad litem*, Saeks discovered that the boys wished to live with their father, and then decided that those wishes were not in their best interests. At this point, Saeks should have realized that he could not simultaneously make a recommendation to the court to deny the boys' wishes and zealously represent their interests as clients. He should have petitioned the court for an order allowing him to withdraw as guardian. The appointment of another attorney as guardian *ad litem* prior to the hearing before the referee would have solved the problem and protected the rights of the boys to have legal representation.

We conclude that Attorney Saeks, who served as both attorney and guardian *ad litem*, had conflicting duties and that he, therefore, failed to provide the boys with proper representation. Mr. Bawidamann's second assignment of error is sustained.

IV

Mr. Bawidamann's second assignment of error having been sustained, the trial court's decision denying his motion for a change of custody will be reversed, and this cause will be remanded for a new hearing.

*Judgment reversed*
*and cause remanded.*

WOLFF, P.J., and BROGAN, J., concur.