[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
This case is before us on the appeal of Talisa Bell from a decision denying her motion for modification of custody. Unfortunately, the course of events leading to the appeal represents an extreme example of a recurring and regrettable tragedy in our society — the use of children as pawns in a war between divorced and embittered parents. Truly, such a war has no victors and the ultimate casualties are the children, who stand to suffer deeply and permanently unless their parents can learn to control their hostility and anger towards each other. We have previously emphasized, and stress once again, that children have certain rights, including "`the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important * * * the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles.'" Thomas v.Freeland (Oct. 10, 1997), Greene App. No. 97-CA-106, p. 3 (citation omitted).
The record in this case is filled with contempt motions filed by each side over matters that should have been resolved without court intervention. These parents are apparently unable to agree on even a simple matter like what time the children should be returned from weekend visitation without involving two attorneys, a judge, and a court reporter. Hundreds of dollars that might have been used to support the children have instead been paid to litigate whether one party or another is required to bear the small cost of transporting the children from Springfield to Chicago. We urge the parties, as well as their counsel, to bear in mind from this time forward what is really important and what is risked by continuing hostilities — the welfare of two children who did not ask to be separated from either parent, who did not ask to choose between people who love them, and who have little control over decisions and actions that greatly affect their lives. As guardians of such precious treasure, parents should be as vigilant in protecting children from their own actions as they are in defending them against others. With these thoughts in mind, we turn to consideration of Talisa Bell's assignments of error.
On appeal, Talisa raises the following three assignments of error:
 I. The trial court erred when it overruled the Defendant-Appellant's objections to the magistrate's decision of January 8, 1997 (trial court's 8-26-97 ruling on objections to magistrate's 1-8-97 decision).
 II. The trial court erred in failing to correct the magistrate's exclusion of relevant evidence (trial court's 8-26-97 ruling on objections to magistrate's 1-8-97 decision).
 III. The trial court erred when it overruled the Defendant-Appellant's objections to the magistrate's decision of April 16, 1997 (trial court's 8-26-97 ruling on objections to magistrate's 4-16-97 decision).
After considering the record and the assignments of error, we find them without merit and affirm the decision of the trial court. Our reasons for doing so are set forth below.
 I
In the first assignment of error, Talisa claims that the magistrate's decision of January 8, 1997, was against the manifest weight of the evidence. As a result, Talisa contends that the trial court should have sustained her objections to the decision. Specifically, the magistrate rejected Talisa's claim that a change in circumstances had occurred such that she should be awarded custody of the parties' two minor children. According to Talisa, these changes were: alleged physical abuse of the children; the failure of the children to live with their father in 1995-1996; the father's interference with Talisa's visitation rights; and the children's wish to live with their mother.
We have recognized in a number of cases that the trial court's discretion in custody disputes is quite broad and that our authority to reverse the trial court is limited to situations where the decision is against the manifest weight of the evidence. See, e.g., Roach v. Roach (1992), 79 Ohio App.3d 194, 208. Manifest weight means that reviewing courts will not reverse "`[j]udgments supported by some competent, credible evidence going to all the essential elements of the case.'" Bawidamann v.Bawidamann (1989), 63 Ohio App.3d 691, 695 (citation omitted). In Roach, we also noted that "[t]he trial court's decision is presumed to be correct, and a reviewing court may only reverse a custody decision upon a showing of an abuse of discretion."79 Ohio App. 3d at 208 (citation omitted). An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
Furthermore, we must defer to the trial court in areas of witness credibility, since the trial court is in the best position to observe demeanor, gestures, and voice inflection. State v.DeHass (1967), 10 Ohio St.2d 230. The Ohio Supreme Court has emphasized that the credibility issue is "even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." Davis v. Flickinger, (1997), 77 Ohio St.3d 415,419.
After applying these standards to the present case, we cannot say the trial court abused its discretion in allowing Everett Bell to remain the custodial parent. While we find certain aspects of the case troubling, we do not believe the trial court's attitude was unreasonable or arbitrary, nor do we find a lack of competent, credible evidence supporting the decision.
R.C. 3109.04(E)(1)(a) controls modification of custody, and provides, in pertinent part, as follows:
 The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, his residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:
* * *
 (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.
In Davis, the Ohio Supreme Court noted that the trial court has "wide latitude to consider all issues which support such a change." 77 Ohio St.3d at 415. The Court also emphasized that:
 "The clear intent of * * * [the] statute is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a `better' environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment."
Id. at 418 (citation omitted).
With respect to the four changes in circumstance alleged by Talisa, the physical abuse charge is obviously of most concern. In this context, the following background is pertinent. During the pendency of the divorce, Everett had temporary custody of the children. The parties' final divorce hearing was held on November 30, 1994, but no decree was filed until May, 1995. At the hearing, Talisa was designated legal custodian and residential parent, with Everett being given the court's standard visitation. At the time of the hearing, temporary orders were in effect barring either party from removing the children from the state. The final decree also stated that a notice of intent must be filed with the court if either parent intended to relocate. Additionally, the court imposed an affirmative duty on each parent to make certain that the children visited with the other parent during visitation periods.
Despite these orders, Talisa left the state and returned to Chicago, where her family lived. She then moved from place to place, concealing the children's whereabouts and depriving Everett of any contact with the children from November 30, 1994, until September, 1995. At all times, Talisa was represented by an attorney and refused to return the children for visitation despite two direct orders from the court to bring the children to Springfield. As a result of a motion for change of custody filed by Everett on March 27, 1995, the court awarded custody of the children to Everett on September 1, 1995, and denied Talisa visitation until she showed a greater degree of responsibility. At that time, Talisa had not only evaded service by failing to claim mail addressed to her at her mother's house, she had also refused to comply with other orders of the court, including the above orders and an order that she disclose her income so that her ex-husband's child support obligation could be calculated. Talisa did not appear at the hearing to modify custody, but her attorney did appear.
Following the award of custody to Everett, Talisa did not see the children for approximately six months. After losing custody, she obtained a new attorney and filed a motion on December 22, 1995, to restore visitation rights. Shortly thereafter, on January 18, 1996, she inexplicably withdrew the motion. Subsequently, on March 4, 1996, with yet another new attorney, she filed a motion to vacate the prior custody award. In this motion, she alleged that Charles Carter, her attorney at the time of the September, 1995, custody hearing, had been ineffective and had not properly informed her about the hearing. An agreed entry was then filed, withdrawing the motion to vacate and giving Talisa four hours of visitation on March 26, 1996. The entry also provided that Talisa was to have weekend visitation on April 19, 1996, and May 17, 1996, in the Dayton-Springfield area. The parties were then to agree on out-of-state visitation and extended summer visitation.
According to Talisa, she first noticed marks on her children during the four-hour visitation in March, 1996. Both Talisa and her mother, Emma Branson, were present for this visitation, and both testified about the marks. However, even on paper, their testimony was not completely convincing. Mrs. Branson testified that they took the children shopping and noticed the marks on the children's legs when they went back to their hotel room. At that time, they had taken the children's clothing off and Talisa was using a lotion to "oil up" the children because she had noticed that their skin was dry. After seeing the marks, they went out and bought a disposable camera to take pictures of the marks, but the pictures did not turn out.
Talisa's testimony was that during the four-hour visitation, they took the children to the Dayton Mall, out to eat at McDonald's, and then to another mall before returning to their room at Day's Inn, where they were staying. They went back to the hotel to check out and gather their things because the visitation time was almost over. When they got to the hotel, Talisa was in a rush to put lotion on Darius's legs because they had to have the children back soon. Both the children had on long pants, so it was necessary to strip off their clothes in order to put on the lotion. At this time, Talisa noticed marks on the children's legs. She agreed with her mother that the camera was purchased after they saw the marks. However, she also testified that from the time she put lotion on her children and noticed the marks, they had only twenty minutes left before they had to return the children. Based on this testimony and the time frame, we question whether there would have been time to dress the children, run out and buy a camera, take pictures, check out of the hotel, and still return the children in a timely fashion. Moreover, we are puzzled over why the marks, if visible, would not have shown up in pictures.
Talisa also testified that she did not take the children to the doctor after originally seeing the marks because she only had a brief amount of time left and did not want to be late returning the children. However, during the next visitation, in April, 1996, she had the children for an entire weekend, but did not take them for a medical exam. It was only in May, 1996, that she took the children to Children's Medical Center. We find this delay inconsistent with Talisa's testimony that she was "overwhelmed" in March by seeing the marks. According to Talisa, she was overwhelmed because she had never known Everett to discipline the children and leave those kind of marks. She did testify that she found some additional marks on her daughter's chest in May.
At Children's Medical Center, the children were interviewed by a social worker and were also examined by a doctor. The doctor did not testify at the hearing. However, the medical notes for Teria, the daughter, indicate that marks on her chest and thighs appeared to be healing lacerations that were relatively superficial. The doctor indicated that the marks may have been inflicted but it was difficult to be certain. Likewise, the notes for Darius, the son, state that "[t]he patient has a number of healed linear abrasions or lacerations (superficial) it is difficult to say how these may have occurred, it would be consistent with some superficial abrasions secondary to a whipping with a switch."
According to the social worker from the hospital, the injuries were healed and there were no fresh injuries. She took photos, but the photos were overexposed and, therefore, were not available at the hearing. The social worker also talked to each child individually. Darius told her his Daddy "whooped" him and Teria stated that her father had hit her with a belt. The children did not give any other information and could not answer when these events happened. Although the doctor found the marks consistent with a whipping with a switch, the social worker expressed an opinion that a belt could leave the same kind of marks. A referral was then made to the Clark County Children's Services Department.
Henrietta Curry, a social worker from the Clark County Department of Human Services, interviewed and examined the children the following day. Again, the children were interviewed separately and without a parent present. Curry checked Teria's chest area and did not see any marks on her chest. She also checked Teria's legs and found several old bruises, plus one long scar that was about six inches long. Teria said she had gotten the scar by falling down. When Curry talked to Teria, Teria said that her father spanked her with a belt sometimes. However, the marks Curry saw were not consistent with someone having been hit with a belt. Curry also checked Darius, but had a difficult time interviewing him because he would not really talk that much. (At the time, Teria was five and Darius was three.) After examining the children, reviewing the medical records, talking to a social worker at Children's Medical Center, and interviewing Mr. Bell and his fiancee, Yolanda, Curry concluded that the abuse claims were unsubstantiated. At the time of the hearing, Curry indicated that her file was still open because Everett and Yolanda had contacted her in July, 1996, to ask her to see the children before they visited with their mother. At that point, Curry took some pictures of the children.
Curry did say during cross-examination that she did not have the assessment from the social worker at Children's Medical Center, which contained the children's statements about being hit with a belt and "whooped." She said she would probably have investigated further at that point if she had the information. However, she also later testified that she did read the statements in the doctor's report about what the children had said, and did talk to the children about being whipped, but still found the allegations of abuse unfounded.
Everett Bell denied causing marks on the children. He testified that he was aware of only one mark, i.e., a mark on Darius' left leg, which he believed Darius had gotten from being scratched by a dog. Everett further said he did not know what his ex-wife was talking about regarding marks, and said the marks were probably there when he got the children from their mother. He also stated that he did not examine the children for marks when he obtained them from their mother in September, 1995. Everett did say that he occasionally spanked the children with his hand, but denied hitting them with a belt.
A guardian ad litem was appointed for the children, was present at the hearing, and took part in the questioning of witnesses. The guardian also interviewed the children, conducted other independent investigation, and reviewed the entire record. In a written report filed after the hearing, the guardian stated that both parents were appropriate care-givers and both were very loving and nurturing. The guardian noted that he had observed some type of healed marks on the children's legs in September, 1996, but also said that investigation never revealed when the marks were made or their cause. The guardian also found the children were doing well under their father's care, were comfortable with the father's fiancee, and were advancing appropriately in school.
Like the guardian, the magistrate concluded that the cause or source of the marks on the children could not be determined. Based on our review of the record, we find competent, credible evidence to support this decision. As we noted above, the testimony about finding the marks in March, 1996, on the first visitation, was not exactly credible. Therefore, the children could have sustained injury at any point when either parent or others had access. Additionally, testimony on the source of the marks was conflicting. Although Teria stated on one occasion that her father hit her with a belt, she stated at another interview that she had fallen down. Furthermore, even if one assumes the children were hit with a belt, the testimony of Henrietta Curry, who had approximately twenty-two years of experience with child abuse cases, was that the marks were not consistent with the children having been hit with a belt. Since those were the only allegations against Everett Bell, the trial court was entitled to find that the source of the marks was never established. Moreover, although the social worker from Children's Medical Center testified that a belt could have left marks like those found on the children, the magistrate could reasonably have chosen to credit Curry's opinion instead. As we mentioned earlier, the trier of facts is in a better position than we are to observe the demeanor of witnesses.
Our conclusion does not mean that we in any way feel child abuse should be ignored or given anything other than the highest scrutiny. We find the possibility of abuse very troubling and it would be a basis for changing custody, if proven. What we are saying is that based on the record before us, competent, credible evidence existed to support the trial court's finding that the source of the marks was not established.
The second change in circumstances mentioned by Talisa is that the children allegedly did not live with Everett during 1995-1996. This argument is based on the fact that Teria attended a pre-kindergarten program at Garden Dale Elementary, which was located in Teria's grandmother's school district in Dayton. This point was not addressed by the magistrate. Instead, the magistrate focused on the living conditions of the children and their parents at the time of the hearing. At that time, the children were enrolled in school in Springfield and Everett was actively involved in their care, including attending school events and parent-teacher conferences, and taking the children to swimming and karate classes after school. We find this focus on the current situation appropriate. For example, at the time of the hearing, Talisa had no permanent home established for the children and was dividing her time between two different residences belonging to other people. Clearly, such a chaotic environment would not be appropriate for the children. However, Talisa also testified that her family was buying a building with three apartments and that one of the apartments was designated for her use. By finding that both parents had adequate facilities, the magistrate obviously focused on Talisa's prospective situation rather than the past. As we noted, this was an appropriate focus with regard to both parents.
Furthermore, the testimony about the 1995-1996 school year was minimal and failed to establish that the children were not living with their father. Everett testified that he enrolled his daughter in Dayton schools using his mother's address and drove Talisa to school from Springfield every morning except on Fridays, when she did not have school. The school records from the Dayton school were submitted and indicated that Talisa arrived in September, 1995 (when her father gained custody) with a very low skill level, but that she had improved tremendously since that time. They also contain notations about Everett as a supportive and involved parent.
Based on the above testimony, we do not believe the trial court erred in failing to find a change of circumstances based on Teria's attendance in school in Dayton. Contrary to Talisa's claims, the evidence did not show that Talisa failed to live with her father during the 1995-1996 school year.
Finally, Talisa alleges that Everett's willful violation of Talisa's telephone visitation and the children's desire to live with their mother are additional changes in circumstance that should have resulted in an award of custody to Talisa. Regarding telephone visitation, the Magistrate found that on several occasions, no one answered the telephone at Everett's home at the time appointed for visitation. As a result, the Magistrate found Everett in contempt because he had not explained why no one answered the phone. However, the Magistrate did not find that this was a change in circumstance meriting a change in custody, nor did the Magistrate find that Everett had willfully denied visitation. We agree with these conclusions. While parties can and must comply with court orders, a few missed telephone calls pale in comparison to the willful deprivation of visitation rights for nearly a year. Furthermore, even after the parties agreed to the telephone visitation in March, 1996, Talisa inexplicably made no calls to the children for a period of over two weeks in May, both before and after she took the children to be examined for abuse. Certainly, this does not excuse the duty to have the children available when ordered, and the Magistrate's contempt finding was clearly intended to discourage further escalation of the ongoing war of retaliation wagered by the parties. On the other hand, the missed telephone visitation was not a "change of substance" warranting modification of custody. Davis, 77 Ohio St.3d 415,418.
As a further matter, we do not place great weight on the children's expressed desire to live with their mother. First, we note that neither party asked for an in camera interview, and the court did not chose to interview the children. R.C. 3109.04(B)(1) indicates that a court may interview a child when allocating parental rights and responsibilities, and shall interview the child upon request of a parent. Therefore, the trial court has discretion in considering the children's wishes. Furthermore, although the guardian ad litem noted that the children expressed a desire to live with their mother, he also qualified this comment as follows: "The children did inform the Guardian ad Litem that they would like to live with their mother but it must be mentioned that this response was elicited in counsel's office while their mother waited outside." Given the children's young ages at the time (five and three) and susceptibility to influence, their wishes are not of significant weight and do not constitute a change in circumstance. In this context, we note that the record does contain some evidence of attempts by Talisa to influence her children about custody. For example, a letter written to Teria in February, 1996, states:
 I'm sorry that Eugene and Yolanda is not allowing us to talk every other day like we use to. I still call but they say I have to wait until Saturday. * * * I've been buying you guys a little something every time I get paid. Whenever I see you, you'll have so much stuff waiting for you."[1]
A letter written to Darius on the same date states that:
 I hope that you like the teddy bear. Whenever you start to miss momma, I want you to hold that teddy bear so tight and just remember that I'm thinking about you and that I"m working very hard for us to be together again.
 Just remember that what goes around comes around, it's sure to come back around and momma is a true believer of that. So if we wait a little longer, you guys are sure to be back home.
In the future, the parties should avoid putting the children in the middle of their battles. As we noted in Thomas, children have the right not to choose sides.
Based on the preceding discussion, the first assignment of error is overruled.
 II
In the second assignment of error, Talisa claims that the Magistrate excluded relevant evidence concerning an act of prior violence by Everett. At the hearing, Talisa tried to present evidence from Perry Branson, her step-father, and from a police officer, about an incident that occurred when Mr. Branson picked up the children on November 30, 1994, after Talisa had been awarded custody of the children at the divorce trial. According to the evidence proffered at the hearing, Everett allegedly punched Mr. Branson in the eye and then pulled Branson's coat over his head, while continuing to punch Branson.
The Magistrate refused to hear the evidence, finding that these facts had not arisen since the custody decision filed in September, 1995, and were also not unknown to the court at the time of that custody decree. Therefore, he held the evidence inadmissible under R.C. 3109.04 (E)(1)(a). In contending that the evidence should have been considered, Talisa argued below and also claims on appeal that the evidence was not previously known to the trial court. As a second ground for admitting the evidence, Talisa says the evidence was pertinent to deciding the best interests of the children. By contrast, the Magistrate felt that R.C. 3109.04(E)(1)(a) restricts consideration of "unknown facts" to the issue of changes in circumstances and does not apply to the issue of the best interests of the children. Based on his remarks at the hearing, the Magistrate also believed the evidence was inappropriate because it did not show a present effect, i.e., the events of two years before did not demonstrate a present change in the children's circumstances.
With regard to the exclusion or admission of evidence, the trial court has broad discretion and our review is for an abuse of discretion. Matter of Demaree (Oct. 22, 1990), Clark App. No. 2696, unreported. As we mentioned earlier, R.C. 3109.04
(E)(1)(a) provides that:
 The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, his residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.
We agree with the magistrate that the ability to present facts unknown to the court relates to the branch of R.C. 3109.04
(E)(1)(a) that forbids modification of custody unless a change in circumstances is shown. The rationale for requiring proof of changed circumstances is to give children stability and to prevent re-litigation of custody issues. See, e.g. Waggoner v. Waggoner
(1996), 111 Ohio App.3d 1, 5, discretionary appeal not allowed,77 Ohio St.3d 1445, and Moyer v. Moyer (Dec. 17, 1996), Franklin App. No. 96APF05-659, unreported. The statute promotes these goals by restricting evidence to facts that were either unknown to the court at the time of the custody decree or arise thereafter. Accordingly, the Magistrate's legal conclusion was correct. Furthermore, even all relevant facts after the custody decree are not necessarily admissible. Instead, the court has discretion to limit evidence to activities occurring a reasonable time before the hearing. See, Schmidt v. Schmidt (1982), 7 Ohio App.3d 175,177.
After reviewing the record, we do not believe the magistrate abused his discretion in rejecting evidence about an event occurring two years before the custody hearing. First of all, the requirements of R.C. 3109.04(E)(1)(a) were not satisfied because the facts were not unknown to the court. In this context, the following factual background is pertinent. In November, 1994, when custody was originally given to Talisa, the case was assigned to Judge Lorig. Later, on January 1, 1995, the case was reassigned to Judge Geyer because of a court reorganization. Between that time and the custody hearing that is the subject of this appeal, Magistrate Salway handled the vast bulk of pending matters, including numerous motions for contempt, a pretrial, and the September 1, 1995, hearing when Everett Bell was awarded custody of the children.
The motion for change of custody prompting the September hearing was filed by Everett on March 27, 1995. In the motion, Everett claimed he had been deprived of visitation since November 30, 1994. Subsequently, on May 3, 1995, Talisa filed a motion for contempt. In the motion, Talisa related the November 30, 1994 incident, in which Everett allegedly kicked Mr. Branson in the face and "pistol-whipped" Branson with a gun (a contrast, we note, to the present allegations about the same incident). In response to these claims, Everett filed a memorandum, denying that he had ever drawn a gun in Branson's presence. Additionally, Everett claimed that the police were called not because of Everett's actions, but as a result of Branson's behavior and unlawful trespass. Talisa's motion for contempt was set for hearing in July, 1995. Talisa then filed another motion on June 2, 1995, objecting to some provisions in the divorce decree and asking to modify visitation, again because of the November 30, 1994, incident. The hearing on this motion was also set in July, 1995.
On July 7, 1995, Magistrate Salway met with counsel for the parties, conducted a pretrial, and set an evidentiary hearing for September 1, 1995. Magistrate Salway also presided over the evidentiary hearing on September 1, 1995. At that time, he found a change in circumstances and awarded custody to Everett. As we mentioned earlier, Talisa was not present at the hearing, but her attorney did appear on her behalf.[2]
Salway was also the magistrate who conducted the hearing on the motion to modify custody that is the subject of the present appeal. At this custody hearing, when Talisa attempted to introduce evidence from Branson about the November 30, 1994, incident of violence, opposing counsel objected and noted that Everett had previously been questioned about the incident at the September, 1995, custody hearing. Discussion then ensued as related above, about whether the evidence was admissible under R.C. 3109.04(E)(1)(a). Eventually, Magistrate Salway refused to admit the evidence.
Given that the alleged incident of violence was brought to the court's attention in pleadings and at the September, 1995, hearing, the facts cannot be considered unknown to the court at the time of the previous custody determination. It is true that Talisa did not present Mr. Branson's testimony at the previous hearing, nor did she appear and testify. Instead of appearing, she chose to rely on the fact that her attorney had filed a motion for continuance of the hearing. However, the motion for continuance was overruled. While Talisa claims her attorney was ineffective and did not properly inform her about the status of the continuance, the record is in conflict about that fact, as the magistrate's decision in September, 1995, indicates that Talisa's attorney thought as late as the evening before the hearing (August 31, 1995) that Talisa would attend. On the other hand, when Talisa filed a motion to vacate the custody decision, she stated that she was told by her attorney on August 29, 1995, that the hearing had been continued. We need not resolve this conflict, however, as the proper remedy would have been to either appeal the custody decision or file a motion to vacate. Although Talisa did file a motion to vacate, she voluntarily withdrew the motion. As a result, the issues raised by that motion are not before us.
Even if we assumed that Talisa did not have a chance to raise the November 30, 1994, incident at the time of the first custody decision, evidence about Everett's prior act of violence would not have been admissible. The evidence was clearly offered to show that Everett had a propensity towards violence and acted in accordance with that character trait when dealing with his children. However, Evid.R. 404(A) specifically forbids admission of this type of evidence, subject to certain exceptions which we do not find applicable. See, e.g., Carter v. Simpson (1984),16 Ohio App.3d 420, 423-24, (excluding evidence of an officer's episodes of excessive force to show that he had either a habit of reacting in a certain way or a violent character and acted in conformity therewith on a particular occasion).
Based on the foregoing discussion, we find that the trial court did not abuse its discretion in failing to allow evidence of a prior violent act by Everett Bell. Again, we stress that our ruling is not to be construed as approving violence in any form. As we mentioned previously, should future acts of violence against these children be proven by appropriate evidence, a change of custody would be warranted.
Based on the preceding discussion, the second assignment of error is overruled.
 III
In the final assignment of error, Talisa objects to the trial court's resolution of the matter of transportation costs associated with visitation. Concerning this issue, the following background is pertinent. On June 13, 1996, Talisa filed a motion asking the court to set visitation. Subsequently, the matter was heard and the court filed an entry on September 5, 1996, indicating that Talisa would have visitation one weekend per month and extended visitation for one month in the summer. The entry also stated as follows:
 The Plaintiff shall arrange for the transportation of the minor children to and from such visitation. The Defendant shall pay one-half of the costs associated with such transportation arrangements. The Defendant shall provide the Plaintiff with documentation to support the transportation costs. At the present time, the Defendant anticipates that she will transport the children to and from Illinois by way of a Pontiac GrandAm rental car with an approximate cost of $40.00 per day.
The Defendant in the lower court was Talisa Bell and the Plaintiff was Everett Bell. Therefore, the order appears to require Everett to arrange transportation, with reimbursement being made by Talisa.
On November 5, 1996, Talisa filed a motion for contempt, alleging that Everett had failed to reimburse her for one-half of the transportation costs. A second motion for contempt was filed on March 13, 1997, based on Everett's continued failure to pay for transportation costs as ordered. According to Talisa, Everett was responsible for one-half of the car rental and one-half of the gas expense for two round trips each month between Chicago and Dayton. At that time, Everett's share of these expenses was allegedly $403.04. In response, Everett filed his own motion for contempt against Talisa for failing to pay an attorney fee award from 1995. In the motion, Everett also sought clarification of the court's previous order on transportation. Specifically, Everett had interpreted the court's order to mean that he was responsible only for the cost of the rental car, not other expenses.
After a hearing held on April 11, 1997, the magistrate interpreted the prior order to mean that Everett was responsible for paying only one-half of the expenses, including rental car and gasoline, during the time the children were actually being transported. Therefore, the magistrate recommended that Everett pay for one-half of the rental car cost and one-half of gasoline expenses for one round trip per visitation. Talisa then objected to the decision, claiming that the magistrate's decision was not a logical interpretation of the prior order, particularly since the magistrate was not privy to the negotiations between the parties.
After holding a hearing on the objections, the trial court issued an order that attempted to resolve the matter. In the order, Judge Geyer noted that he had been present during the original discussions on transportation, and that the parties had agreed to share the cost of a rental car and gasoline because the wife represented that she did not have an acceptable vehicle at the time to transport the children. The court also stated that the costs associated with a rental vehicle should be of a temporary nature and should terminate within a reasonable time. Specifically, the court felt neither party to a divorce should be responsible for reimbursing the other for motor vehicle expense, even for visitation. As a result, and to end the contention over the issue, the court ordered Everett to pay the expenses Talisa had requested for the months of September, 1996, through December, 1996, i.e., Everett was required to pay one-half the expenses for gas and rental car for both round trips. The court then stated that beginning January, 1997, Everett would be responsible for paying a monthly sum of $30.00 for visitation.
Talisa appeals from this decision of the trial court, contending that the court had no jurisdiction to alter the agreement of the parties. Talisa also claims that the trial court can modify court orders regarding the children only upon a finding of changed circumstances. Everett's response is that the agreement and the court entry reflecting the agreement were ambiguous and did not adequately clarify exactly what costs were involved.
We have previously noted that "[i]n modifying visitation, the trial court must consider the best interests of the child, but the court has broad discretion in this regard, so long as its orders are "`just and reasonable.'" * * * We review such a decision for an abuse of discretion." Brown v. Brown (Aug. 29, 1997), Montgomery App. No. 16039, unreported, p. 3 (citations omitted). After reviewing the trial court's decision, we find no abuse of discretion.
At the outset, we reject the contention that a change in circumstances is required for modification of visitation. As was mentioned in Roudebush v. Roudebush (1984), 20 Ohio App.3d 380, custody and visitation involve different considerations and the court has a broader measure of discretion in setting visitation. Nothing in R.C. 3109.051 indicates that visitation modification is conditioned on a change of circumstances. Rather, the best interests of the children are to be considered.
In our opinion, the trial court's decision was an appropriate interpretation of the agreement and also focused on the best interests of the children. From the judge's comments, it appears that the parties did not expect the rental car arrangement to last indefinitely. However, the entry did not include a time limit on such expenses. To this extent, the entry was ambiguous and did not accurately reflect what the judge recalled about the negotiations. Since the judge presided over the negotiations, he would have been in a position to know what the parties intended. The order was additionally confusing in that it indicated the Plaintiff (husband) was responsible for transportation and the Defendant (wife) would pay for half the costs. The entry also did not mention any specific costs, other than the rental car.
In a related context, courts have held that they have power to clarify separation agreements where good faith confusion exists over the requirements of the decree. See, Bond v. Bond (1990),69 Ohio App.3d 225, 228, and In re Marriage of Seders (1987),42 Ohio App.3d 155, 157. While the order in the present case did not involve a separation agreement, we believe the court had the power to clarify its own order. See, R.C. 3105.011 (giving the domestic relations court full equitable powers and jurisdiction appropriate to all domestic relations matters). Furthermore, as we already mentioned, the court can modify a visitation arrangement to serve the best interests of the children. Consequently, we find no error in the trial court's decision. Instead, we find the court's order particularly appropriate in the context of this case.
As we noted earlier, these two litigants cannot agree on the most trivial matters without court intervention, despite the fact that continued conflict and hostility is not in the best interests of the children. At the hearing, the parties and their attorneys were even disputing the number of times the gasoline tank had been filled or needed to be filled on various trips. By ordering a specific sum to be paid monthly, the trial court was sensibly attempting to eliminate one area used by the parties to vent their ill will towards each other. This is a laudable move, not an abuse of discretion.
As an additional matter, although Talisa claims that the court did not have a factual basis for the amount that was ordered, we find adequate facts in the record to support the decision. Specifically, on one of the exhibits Talisa submitted, the gas cost for two round trips is listed at $60.00. Half of that amount would be $30.00, which is the amount the trial court awarded. Since the trial court did not abuse its discretion, but tried to achieve a reasonable solution based on its recollection of the parties' intent, we find no error in its decision. Accordingly, the third assignment of error is overruled.
Having overruled the Appellant's assignments of error, we affirm the judgment of the trial court. As a parting note, we would again urge both parties to focus on their children's welfare instead of their own bitterness.
KERNS, J., and MILLIGAN, J., concur.
(Hon. Joseph D. Kerns, Retired from the Court of Appeals, Second Appellate District and Hon. John R. Milligan, Retired from the Court of Appeals, Fifth Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).
Copies mailed to:
Linda Cushman
Valerie R. Wilt
Gregory Lind
Hon. Douglas W. Geyer
[1] Eugene is Everett's middle name and he is often referred to as Eugene.
[2] Talisa's attorney, Charles Carter, was suspended from practice about three weeks after the September, 1995, custody hearing. See, In Re Report of Commission on Continuing LegalEducation, Charles Edward Carter (1995), 73 Ohio St.3d 1460. However, the suspension was not connected to Carter's representation in the present case, but was a result of Carter's failure to comply with Continuing Legal Education reporting requirements and to pay a fine associated with the non-compliance.